Gloucester Ice & Cold Storage Co. v. Commissioner.
Gloucester Ice & Cold Storage Co. v. Commissioner
Docket No. 68913.
United States Tax Court
T.C. Memo 1960-196; 1960 Tax Ct. Memo LEXIS 97; 19 T.C.M. (CCH) 1015; T.C.M. (RIA) 60196; September 21, 1960
*97 Held, that debenture bonds, which were held by petitioner's stockholders or members of their families in proportion to their stockholdings and which were issued by petitioner in connection with an expansion program and simultaneously with the retirement of its preferred stock, represent a proprietary interest in the corporation rather than an indebtedness, and consequently, payments on such debenture bonds are not deductible as interest by petitioner. Held, further, certain expenditures made by petitioner in 1955 for pump parts and a section of a chute are deductible repairs in that year. Harry Bergson, Jr., Esq., 209 Washington Street, Boston, Mass., for the petitioner. Frank V. Moran, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioner's income tax as follows: Taxable
Year
Deficiency
1952
$4,970.26
1953
1,123.43
1954
3,314.68
1955
4,057.38
The questions are whether petitioner is entitled to deductions of $7,000 during each of the years 1952 to 1955, inclusive, representing interest payments to the holders of its 7 per cent Debenture *98 Bonds, and whether certain expenditures in 1955 should have been capitalized or were deductible as having been made for repairs. Findings of Fact The stipulated facts are found accordingly. Petitioner is a corporation organized under the laws of the State of Massachusetts in November 1938 and is located in the City of Gloucester, Massachusetts. It is engaged in the business of manufacturing and selling ice, and furnishing freezing and cold storage service particularly to fishing fleets. Petitioner filed its income tax returns for 1952 to 1955, inclusive, with the district director of internal revenue for the district of Massachusetts. Petitioner's authorized capital consisted of 10,000 shares of no par common stock and 1,000 shares of 7 per cent Cumulative Preferred stock par value $100. The 10,000 shares of petitioner's common stock were attributed a value of $0.10 per share. The officers and directors of petitioner at all times material hereto were: John Ryan
President & Director
James A. Ryan
Treasurer & Director
Harry Bergson
Clerk & Director
John W. Ryan
Director
Samuel L. Deitsch
Director
Sometime prior to November 1938 the United States, *99 under its W.P.A. program, the State of Massachusetts, and the City of Gloucester, in order to stimulate the fishing industry, erected a pier in Gloucester and a building situated thereon suitable for freezing and storage of fish. All of this was done pursuant to various acts of the legislature of Massachusetts and the building, situated on the State Pier, consisted of a fully-equipped freezer and storage building and 10 stores for the filleting and packaging of fish. The freezer and cold storage building was erected at a cost of $1,050,000, of which the Federal Government contributed $400,000, the State of Massachusetts $600,000, and the City of Gloucester $50,000. The building was complete and ready for the renting authority, Gloucester Community Pier Association, to lease to someone to engage in the business of manufacturing ice for the fishing fleet and for the freezing and cold storage of fish. John Ryan procured for petitioner a lease of the freezer and cold storage building from the Gloucester Community Pier Association, and for his service in procuring said lease the 10,000 shares of petitioner's common stock were issued to him. Upon receipt of the 10,000 shares of petitioner's *100 common stock, John Ryan donated 3,000 shares to petitioner, which stock was held by petitioner as treasury stock. The lease above mentioned was for a term of years beginning on November 1, 1938 and ending on September 30, 1949 for a rental of $30,000 a year with the right in the lessee to extend the lease for a further term of 20 years from September 30, 1949 on the same terms and conditions, except that the rent for the additional term should be mutually agreed upon, and if the parties were unable to agree, the rental would be settled by arbitration in the manner set forth in the lease. Petitioner commenced business on January 1, 1939 and on August 22, 1939, 327 shares of petitioner's 7 per cent cumulative preferred stock were issued for $100 per share. Thereafter, from time to time between September 21, 1939 and November 14, 1940, 173 shares of petitioner's 7 per cent preferred stock were issued. One thousand five hundred shares of the common stock held by petitioner as treasury stock were given as a bonus to the subscribers of petitioner's preferred stock, the distribution being three shares of common stock for each share of preferred stock. Petitioner's profits before Federal *101 taxes (or losses) and the amounts of dividends paid for the taxable years 1939 to 1951, inclusive, as per its books were as follows: Profit (Loss)
Dividends
Before Fed-
Com-
Pre-
Year
eral Tax
mon
ferred
1939
($11,598.10)
1940
4,240.11
1941
4,394.59
$3,500.00
1942
17,931.15
9,625.00
1943
27,976.58
$ 2,500
3,062.43
1944
62,952.86
7,500
1945
45,321.65
7,500
1946
69,939.29
10,000
1947
27,146.30
10,000
1948
87,180.94
20,000
1949
93,853.51
20,000
1950
41,629.24
5,000
1951
53,179.17
10,000
The Cape Pond Ice Company was a corporation organized under the laws of the State of Massachusetts in 1902 and is located in the City of Gloucester. It was engaged in the business of harvesting and selling natural ice in Gloucester, chiefly to the fishing fleet. It owned several ponds in the towns near Gloucester from which it cut natural ice and stored same in the ice houses located on the shores of the ponds. It also owned a wharf on Commercial Street situated on the water front of Gloucester Harbor and on it maintained a storage crusher plant for the purpose of furnishing crushed ice to the fishing boats operating out of *102 Gloucester. The issued and outstanding capital stock of the Cape Pond Ice Company consisted of 382 shares of common stock par value $100 per share. In 1943 the petitioner decided to call the preferred stock and at the same time purchase the Cape Pond Ice Company. In order to effectuate this plan, petitioner issued its "7% Debenture Bonds" in the face amount of $100,000 and a holder of preferred stock (which had been called for retirement) was permitted to exchange said stock for debentures of an equal amount in face value. The plan adopted by petitioner also provided that the remaining 1,500 shares of petitioner's treasury stock would be given as a bonus to the subscribers of the $100,000 7 per cent debenture bonds who paid cash for said bonds at the rate of three shares of common stock for each $100 bond so purchased with cash. No shares of common stock were given to those who exchanged their preferred stock for debentures. The following schedule shows the names of the holders of petitioner's securities, family relationships, the number of shares of common stock and amount of investment in preferred stock as of September 15, 1943, and the investments in debentures after the call *103 of the preferred on September 20, 1943: Com-
Pre-
7% De-
Security Holder
Relationship
mon
ferred
benture
John Ryan
3,790
John or Mary Ryan
Husband & Wife
90
3,000
4,000
John Ryan Tr. for Constance
Daughter of John
75
2,500
5,000
John W. Ryan
Son of John
5,000
Mary T. Ryan
Wife of John
150
5,000
10,000
Lillian (Ryan) Hodges
Daughter of John
75
2,500
5,000
Irene (Ryan) Ready
Daughter of John
75
2,500
7,000
James A. Ryan
Brother of John
310
1,000
2,000
John Ryan Tr. for John W.
Son of John
75
2,500
Ryan
Vincent Coppola Tr. for
363
3,300
6,600
Vincent, Jr.
Gloria Coppola
Wife of Vincent
6,000
Rose Coppola
Sister of Vincent
180
3,000
Harry and Augusta Bergson
Husband & Wife
730
500
1,000
Harry Bergson, Jr.
Son of Harry
15
500
500
Elizabeth Bergson
Wife of Harry, Jr.
15
500
Samuel L. Deitsch
1,300
Frances S. Deitsch Tr. for
Wife and Daughter
30
500
1,000
Frances
of Samuel L.
Samuel L. Deitsch, Jr.
Son of Samuel L.
30
500
1,000
Frances S. Deitsch
Wife of Samuel L.
464
4,900
9,800
Louis Wersba
18
300
600
Lois Wersba
Daughter of Louis
363
3,300
3,300
Natalie Wersba
Wife of Louis
30
500
1,000
Alice Marr
300
5,000
10,000
John D. Marr
Son of Alice
500
Marr's late
husband
David Levine
42
700
1,400
Bernard Klawans
60
1,000
2,000
Bert Reinitz
120
2,000
2,000
John A. & Esther Cullen
60
1,000
2,000
Marista O'Connell
120
2,000
4,000
Helen M. Hurley
120
2,000
4,000
William Jacobs
2,000
Philip Jacobs
500
Mannie Kornreich
2,000
F. W. Bryce
500
*104 On October 29, 1943, petitioner purchased 366 shares of the common stock of Cape Pond Ice Company for $136,325.50 and about the same time petitioner borrowed from the First National Bank of Boston the sum of $65,000 at 4 per cent interest. Said loan was repaid in full as of October 31, 1944. Petitioner's balance sheets as of December 31, 1942 and December 31, 1943, are as follows: Gloucester Ice & Cold Storage Co.
Balance Sheet
December 31, 1942
Assets
Current Assets
Cash
$ 12,174.85
Accounts Receivable
20,221.40
Ice on Hand
1,620.00
Investments - U.S. Tax Notes
5,000.00
Investments - Securities
14,724.73
Gloucester Dehydrating Process Co.
865.91
$ 54,606.89
Fixed Assets
Machinery & Equipment
$ 27,678.74
Furniture & Fixtures
88.28
Motor Vehicles
2,102.70
$ 29,869.72
Less - Reserve for Depreciation
5,991.93
23,877.79
Prepaid Items
Insurance
$ 354.75
Supplies - Ice
52.00
Supplies - Office
60.00
Cartons & Boxes
506.10
Refrigerants
117.17
Fuel Oil
28.20
Repairs - Ice
750.00
Construction Material
370.00
2,238.22
Leasehold
1,000.00
$ 81,722.90
Liabilities
Current Liabilities
Accounts Payable
$ 13,268.69
Notes Payable - Bank
$11,736.06
Less Notes Rec. Discounted
11,069.94
666.12
Notes Payable & Equipment
825.00
$ 14,759.81
Owed Officers & Directors
6,304.42
Reserves & Accruals
Payroll
$ 158.53
Taxes
825.49
Water
250.00
Compensation Insurance
1,050.72
Social Security
1,480.38
3,765.12
Capital Stock
Preferred Stock
$ 50,000.00
Common Stock
1,000.00
51,000.00
$ 75,829.35
Surplus
5,893.55
$ 81,722.90
*105 Gloucester Ice & Cold Storage Co.
Balance Sheet
December 31, 1943
Assets
Current Assets
Cash
$ 6,084.85
Accounts Receivable
19,482.60
Notes Receivable
$20,000
Less Notes Rec. Discounted
20,000
Ice on Hand
5,079.00
Investments - U.S. Govt. tax
9,000.00
notes
Investments - Cape Pond Ice
138,825.00
Co.
Investments - Other
13,101.86
Securities
Gloucester Dehydrating
976.32
$192,549.63
Process Co.
Fixed Assets
Building
$ 2,446.85
Machinery & Equipment
32,315.53
Quickfreeze Equipment
36,963.78
Car and Tractor
2,047.30
$ 73,773.46
Less Reserve for
9,242.19
64,531.27
Depreciation
Prepaid Items
Insurance
$ 705.39
Supplies - Ice
409.36
Supplies - Office
116.06
Supplies - Freezer
412.13
Refrigerants
107.42
Repairs - Ice
750.00
2,500.36
Leasehold
1,000.00
$260,581.26
Liabilities
Current Liabilities
Accounts Payable
$ 22,141.42
Cape Pond Ice Co.
13,000.00
Notes Payable - Bank
45,000.00
Notes Payable - Equipment
13,700.00
Notes Payable - Others
25,000.00
$118,841.42
Owed Officers & Directors
7,375.34
Reserves & Accruals
Payroll
$ 699.19
Taxes
1,555.17
Water
250.00
Interest
377.21
Social Security & Payroll
2,022.37
4,903.94
taxes
Debentures - 7% due 1963
100,000.00
Common Stock
1,000.00
Surplus
28,460.56
$260,581.26
*106 Petitioner paid the $7,000 interest each year on the debenture bonds and as of November 30, 1959, a sinking fund account on petitioner's books for retirement of the bonds had a balance of $68,181.40. During each of the years in question petitioner distributed $7,000 to the holders of its debentures and took deduction therefor as interest on indebtedness. Respondent disallowed the deductions explaining that he had determined that the bond issue in the amount of $100,000 was capital rather than a loan and the $7,000 "is considered to be dividends". Also on its return for the year 1955 petitioner took deductions for repairs in the amount of $17,045.10. Respondent, in his notice of deficiency, disallowed the following items of such expenditures on the ground that they were capital expenditures and not repairs: Gould's Pump, Inc. - New Pump
(Pipe line)
$297.00
B. Peterson - New Ice Chute
198.00
Hayes Pump - Parts for new pump
398.40
The items for pumps were for replacement of the interior of two salt water pumps. Because of the corrosive action of the salt water the interior of these pumps have to be replaced at least every two years, depending somewhat on *107 how much business petitioner did. The item for the repair of the ice chute was for the replacement of the bottom section of the ice chute, which replacement has to be made frequently. The above expenditures were for repairs and not capital expenditures. Opinion The principal issue in this case is whether petitioner's payments to the holders of its debenture bonds were payments of interest or dividend distributions. The issue presents the question of whether the debenture bonds are to be considered evidences of indebtedness for income tax purposes or of a proprietary stock interest in the corporation. This problem has been present in many cases decided by this and other courts. We have held the issue presents a question of fact and in several cases we have listed some of the factors to be used as a basis for the determination. , affd. , reversing ; ; ; , affd. ; , affd. , *108 certiorari denied ; and Gokey Properties, Inc., 34 T.C. - (Aug. 12, 1960). The question is largely one of intent: "One must still look to see whether the socalled creditors placed their investment at the risk of the business, or whether there was an intention that the alleged loans be repaid in any event regardless of the fortunes of the enterprise." , pp. 578-579. That intent will be gleaned from the facts as a whole. The fact that the security is in the form of a debt obligation payable in any event will not be controlling. When, by virtue of stock ownership, the bondholders control the fortunes of the corporation it is obvious the money advanced on bonds, be they ever so absolute as debt instruments in form, could be intended as venture capital placed at the risk of the business. When it appears the stockholders own the bonds approximately in proportion to their shareholdings there is a strong inference that their advancements were, and were intended to be, in the nature of capital investments. In the instant case we find approximately all of the stockholders or members *109 of their families owning debenture bonds in proportion to their shareholdings. It is admitted the debenture bonds satisfied all of the formal requirements to make the instruments effective as debt obligations. And the record establishes they were treated as debt obligations with interest payments made when due and appropriate accruals to a sinking fund to provide for their retirement at maturity. Petitioner argues the form of the instruments, along with the fact that the debentures were issued for the business purpose of buying out a competitor, establishes the debenture issue as not venture capital but true indebtedness. As we have seen the form of the instrument is only one factor to be considered and the stated purpose of the issue, to purchase the Cape Pond Ice Company, is most unfavorable to petitioner's position that the issue did not represent capital. By purchasing all but a few shares of the Cape Pond Ice Company, petitioner acquired not only a going ice business that had existed in Gloucester since 1902, but also its assets consisting of several ponds with ice storage houses, a wharf on the water front of Gloucester Harbor, and a storage crusher plant suitable for use in *110 furnishing crushed ice to the fishing boats operating out of Gloucester. Before the purchase petitioner had fixed assets of less than $25,000. It rented its fully-equipped plant in which it carried on its business of manufacturing and selling ice in Gloucester. Certainly the acquisition of such fixed assets by petitioner, with money supplied by the stockholders in proportion to their stock interest, points most strongly to an intent to place the money at the risk of the business. The obvious effect of what was done is that the stockholders, by buying the debenture bonds in proportion to their stock interest, became pro rata owners of a complete ice business, including ponds, a plant and other buildings. The very purpose of their advancements was an investment in new assets several times the value of petitioner's existing assets, which had presumably been procured by risk capital. In a somewhat similar situation in , where the issue was whether a stockholder's advance of funds to his corporation was to be deemed capital or loan, we said: "Substantially all, [advances] had apparently been invested in the corporation's organization and plant, *111 a permanent asset. Advances for such a purpose are by their very nature placed at the risk of the business. * * *" There is really no difference between the stockholders supplying all of the working capital ( , affd. ) or substantially all of such working capital ( ), and the stockholders supplying the corporation funds to invest in its fixed assets. Stockholder advancements for such purposes strongly indicate an intention to place the advancements at the risk of the business. Nor do we think it at all material that here the debenture bonds were issued after the corporation had been in business five years and had shown increasing prosperity. Here petitioner was expanding. Petitioner so states on brief. It was acquiring new assets at a cost of about two and half times the amount of its capital represented by stock. In , we held: "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount *112 paid in is a contribution to the corporation's capital and is placed at risk in the business. * * *" The same strong inference arises when the stockholders make advancements in order to expand a going business that is almost wholly without the necessary capital to finance the expansion. Petitioner's action in calling the stock for retirement and simultaneously authorizing the debenture bond issue in order to buy Cape Pond Ice Company shows quite clearly that the debenture bond money was intended to be at the risk of the business. Indeed, using book values, the bond issue could be at no other risk. There was almost no paid-up capital left after the preferred stock was called. [1] "Ordinarily a loan to a corporation, if not otherwise secured, has the assurance of capital having been paid into the corporation so that the assets purchased therewith are subject to the payment of the loan." *113 The arrangement whereby the preferred stock could be exchanged for debentures of the same face value is a circumstance to be considered as indicating a risk advancement. It is true, as petitioner points out, there are cases where such an arrangement was present ( ; ) and debentures were upheld as loans. But that merely means the presence of such a planned exchange of stock for debentures is not controlling. Certainly the exchange of instruments representing risk advancements such as stock, for instruments representing debt such as bonds or debentures, always gives rise to a permissible inference the advancement is to continue at the risk of the business. It may be dispelled by other circumstances as we have held, but we see nothing in this case to weaken the inference arising from the exchange of stock for debenture bonds. Other facts and circumstances are quite consistent with the debenture bonds being a continuation of the risk advancement represented by the stock. When a debenture issue held by stockholders renders the debt-to-equity ratio disproportionately high, there is present *114 what we called in , a "suspicious circumstance" pointing toward the reality of a risk advancement. Here the balance sheet of the corporation at the end of 1942 (which is all we have), shows book value assets of $81,722.90 and liabilities of $24,829.35, resulting in an equity capital of $56,893.55 before the call of the preferred stock. After the call, there would remain $6,893.55. The hundred thousand dollar debenture bond issue would result in a debt-to-equity ratio of about 15 to 1, which is sufficiently disproportionate as to warrant the inference that the stockholders were placing their money at the risk of the business. Petitioner argues the equity capital should be increased by the value of its lease, said by its witness to amount to $230,000 in September 1943. No lease value was carried on the books of the corporation. The debt-to-equity ratio is only one circumstance, amongst others, to be examined to see if a risk advancement was intended. We think the inference that it was is warranted even though such an intangible asset as the value of a lease, not listed by the corporation as an asset, is omitted in the debt-to-equity ratio calculation. *115 It probably would be true that a corporation's failure to carry a physical asset on the books would not indicate its lack of value. But when such an asset as a leasehold, in which the corporation has no capital investment, is not carried as an asset, it is evidence that no value was ascribed to it by the stockholders who were advancing funds to the corporation. The most important limiting factors to leasehold value are the covenants of the lease. Here there is no specific clause that grants or forbids assignment but the lease indicates it is assignable for it speaks of the lessee, or "its successors and assigns." However, the lease contains many covenants pertaining to the use of the property, including clauses that obligate petitioner to furnish the occupants of store buildings on the pier, "electricity, heat, hot and cold water, salt water, ice and refrigerants," all for reasonable charges. It even obligates the petitioner to render its services of freezing fish and furnishing cold storage at the same price to all persons and its prices for said services or for its ice sales must "be reasonable and competitive with like prices fixed for the time being by the Commonwealth Ice *116 and Cold Storage Company located on the Boston Fish Pier in Boston, Massachusetts." It obligates petitioner to render its services without favoritism and if there is reasonable complaint as to its charges being unreasonable, its rates of charges are to be submitted to a Board of Arbitrators "who shall be empowered to fix in writing fair and equitable rates." The opinion of petitioner's expert witness that the leasehold had a value of $230,000 in September of 1943 can be given little weight. Besides, being mostly based on hindsight, it is apparent he gave no consideration to the restrictions and obligations of the lease. The best evidence of the value of the lease in 1943 is the fact that it was extended in 1949 for a period of 20 years at the same rental although the rental for the extended period could have been the subject of arbitration. This indicates the rental called for in the lease was not substantially below the true rental value of the property or, in other words, that the lease had no ascertainable market value in 1943. In our computation of the debt-to-equity ratio resulting from the bond issue, we give no value to the lease. We are satisfied the bond debentures constituted *117 a proprietary interest in petitioner in the nature of stock rather than bona fide indebtedness. We hold the payments to the debenture bondholders were not deductible as interest. The second issue involves expenditures in 1955 for pump parts and a section of a chute which were disallowed as not being repairs. The plant engineer, who gave the only evidence on the issue, testified the expenditures of $297 and $398.40 represented repairs; that the expenditures were for replacements for the interiors of two salt water pumps, that the salt water was highly corrosive; and that such replacements have to be made frequently - "two years would be the limit". The plant engineer also testified the bill for $198 also disallowed represented repairs in that it was replacement of the lower section for an ice chute. He said this chute "takes a terrible beating from ice." It was not a replacement of the entire chute but just one section. We hold for petitioner on the issue. The disallowed items were repairs and therefore correctly deducted. Decision will be entered under Rule 50. Footnotes
1. See balance sheet for December 31, 1942 showing Assets of $81,722.90 and Liabilities including stock liability of $75,829.35. With the debenture issue and the simultaneous call of the preferred stock (using figures at the beginning of 1943, which is all we have) the capital at the time of the debenture issue would be less than $7,000.↩